## *IN RE* CALDERÓN LASSÉN

ENRIQUE CALDERÓN LASSÉN, ANTONIO ACEVEDO TORRES, ALE-
JANDRO C. ANTONGIORGI VEGA, ELPIDIO ARCAYA PEÑA,
FLOR DE MARÍA CASTELLANOS, PEDRO A. CLAVEROL RI-
VERA, HÉCTOR ANÍBAL COLÓN CRUZ, ÁNGEL ALFONSO
COLÓN, DAVID CORREA HERNÁNDEZ, FÉLIX R. DEL CASTI-
LLO HERNÁNDEZ, ORLANDO A. DISDIER DÍAZ, JULIO C. GON-
ZÁLEZ ROMÁN, OLAGUIBEET A. LÓPEZ PACHECO, MARCOS
R. MALDONADO PABÓN, GUILLERMO MÉNDEZ MUÑOZ, GIL
ALFONSO MORALES RIVERA, HERBER MUSSENDEN ROTGER,
PEDRO N. ORTIZ TORREFORTE, RAFAEL PACHECO RIVERA,
ALICIA PLATET CANALES, MIGUEL ÁNGEL SALICRUP CA-
BELLO, VICENTE SANTIAGO REYES, MIGUEL TORRES LA-
FUENTE, LUIS TOTTI, JUAN JOSÉ TURULL LAFFIGNE,
petitioners.

### APPLICATIONS FOR ADMISSION TO
### BAR EXAMINATION

#### ORDER

San Juan, Puerto Rico, June 17, 1963

The foregoing petitions for admission to bar examination
are hereby approved. Notify the Board of Bar Examiners
for further proceedings.

It was so agreed by the Court as witness the signature
of the Chief Justice, who, together with Mr. Justice Blanco
Lugo, Mr. Justice Dávila, and Mr. Justice Ramírez Bages,
does not agree with the admission of petitioners to the bar
examination. The Chief Justice and Mr. Justice Blanco Lugo
shall deliver separate opinions with the grounds for their
dissent.

(s) Luis Negrón Fernández
*Chief Justice*

I attest:
(s) Joaquín Berríos
*Acting Secretary*

—O—

Mr. Justice Santana Becerra expresses his opinion.
San Juan, Puerto Rico, August 9, 1963

The petitioners obtained their law degrees from the Law School of the Inter American University. They filed their applications for admission to the bar examination while a Rule of this Court was in force, which insofar as pertinent provides:

"The exercise by the Superior Educational Council of its function of approving law schools established in Puerto Rico, for the purposes of this Rule, shall not impair the inherent power of this Court to make its own determination as to the admission of graduates from said schools to the bar examination, under circumstances warranting it."

It is clear to me that whatever the interpretation is or has been—in other circles—of Act No. 88 of April 25, 1949, the determination of who is to be admitted to bar examinations to practice the legal profession in Puerto Rico, insofar as professional quality is concerned, is an exclusive function of the Supreme Court, and in this respect any absolute delegation, directly or indirectly, of that judicial function and any limitation thereof, is improper.

Assuming, nevertheless, that the presence of "circumstances warranting it" would be required for the Supreme Court to exercise fully that untransmissible function, I voted for the admission of these applicants to examination:

Because they obtained their law degrees in a law school which belongs to an institution of higher learning such as the Inter American University, an institution of higher learning which enjoys merits that only a biased or prejudiced mind would venture to question;

Because as the "Report Concerning the Accreditation of the School of Law of the Inter American University" has been brought as proof in this matter, I believe—without

wishing to evaluate now the equitable aspect of such Report —that the manner in which the Accreditation Committee which rendered the Report was constituted does not respond to the best sense of creation of an entirely unbiased and trying body;

Because the Faculty of the School which granted degrees to the applicants is composed of professors of great knowledge and vast experience in the disciplines of law, who are distinguished members of the bar, the professorship, the bench, in their private as well as in their public life, who do honor and bestow prestige to any law school;

Because the applicants are persons who with laudable sense of devotion and dedication to the study have wanted to improve in their capacities and potentialities;

Because it would be unjust, in answer to that wish of attaining intellectual perfection and of becoming more useful citizens, to close the doors to them and to curb their aspirations after having already obtained their degrees, to deny them the opportunity, for unsubstantial reasons to me, to show by means of an examination whether or not they are professionally qualified to practice the legal profession;

Because if there should exist good standards in the preparation of a lawyer, I do not believe that the practice of the legal profession should remain only within the reach of the chosen ones who under idealized conditions have been treated more favorably by luck or chance;

Because in my opinion, the office of attorney must be one eminently of social usefulness for the benefit of the entire community.

In view of the foregoing, and because I do not believe in the destruction of spiritual values, I voted for the admission of these applicants to the bar examinations. The document written by Dr. Ronald C. Bauer, President of the Inter American University, "regarding the process of accreditation of the Law Faculty of the aforesaid Educational Institution,"

published in "El Mundo" in its edition of April 17, 1963, is attached to the record of this case, as part of this opinion.*

My separate vote will be filed with the record.

—O—

Mr. Chief Justice Negrón Fernández, dissenting.
San Juan, Puerto Rico, August 5, 1963

This Court cannot be the image of some values in crisis. The determination to admit petitioners herein to the bar examination constitutes a regression in the concept of the legal education in Puerto Rico that we should not have sanctioned. In effect it sets aside—through an immoderate exercise of power—the public policy declared by the Legislative Assembly in Act No. 88 of April 25, 1949, which establishes an accrediting system for private educational institutions to be invested *with public authority* for the exercise of their educational functions, to grant credits, and to confer academic degrees. Actually, it prejudges any other petition for admission to examination that in the future other applicants from the same academic source may file in this Court, because it is doubtful that in regard to their legal studies there may be produced less favorable circumstances to their admission than the present.

We have dangerously pledged the sense of our institutional responsibility in departing—without means or instruments to determine them ourselves—from the rules promulgated under the authority of the law by the body authorized to gauge the values of capacity and efficiency of the schools of law in Puerto Rico.

We have even ignored the basic norms of admission contained in our own Rules—adopted pursuant to the recommendations of the Committee of Legal Education and Admission to the Practice of Law of the Judicial Conference of Puerto

---

* COMPILER'S NOTE: This document appears on page 949 of this volume.

Rico—upon making use of the inherent power which we recently reserved to be exercised only "under circumstances warranting it."

We have admitted to examination petitioners herein in evident confusion of the values involved. Moving in retrogression in the ambit of legal education we do not advance towards the superiority that we pursue in the profession of democracy, which is the practice of law.

—O—

### Separate opinion of Mr. Justice Blanco Lugo.
### San Juan, Puerto Rico, June 28, 1963

The result of the decision in relation to the approval of the applications for admission of several graduates of the Inter American University compels me to explain the reasons I had for not agreeing with the majority opinion. Nothing more appropriate than to start with a review in chronological order of certain fundamental facts which have been apparently neglected or deliberately ignored.

By order of November 3, 1959 this Court amended its Rule 8(a)(1)(a) referring to the admission to the practice of law, in order to require, in the pertinent part, that all applicants "shall file . . . a written application stating under oath: . . . [that] *has pursued every course of law in and is a graduate of a law school approved by the American Bar Association or by the Supreme Court of Puerto Rico.*" (Italics ours.) Since January 18, 1950 we had only required that an applicant be a graduate from a law school accredited by the American Bar Association or by the Supreme Court of Puerto Rico, without reference whatsoever to the institution in which he pursued his studies.[1] This explains why persons

---

[1] This language was preserved through the revisions of Rule No. 8 on December 21, 1953 and March 29, 1954.

Rule No. 8(1) of the Rules approved March 15, 1946 stated

who studied before 1959 in the San Juan School of Law, but who showed diplomas issued by the universities of Puerto Rico and Kansas City,[2] were admitted to examination.

On December 12, 1960, Rule No. 8(a)(1)(a) was again amended *by the unanimous vote of all the judges who then composed this Court*, by virtue of which the applicant was required to state that he "has pursued every course of law in and is a graduate of a law school approved by the Superior Educational Council, if the applicant has pursued his law studies in Puerto Rico, or by the American Bar Association or the Supreme Court of Puerto Rico if the applicant has pursued his law studies outside of Puerto Rico."

During February 1961 the Chancellor of the University of Puerto Rico announced the rules proposed to govern the accreditation of law schools, pursuant to the provisions of Act No. 88 of April 25, 1949.[3]

On June 29, 1961 this Court adopted a new set of rules which preserved Rule 8(a)(1)(a) as it read on December 12, 1960.

On July 22, 1961 the Superior Educational Council, at the request of the Chancellor of the University of Puerto Rico, adopted the rules for the accreditation of law schools,[4]

that only graduates of the University of Puerto Rico and of universities classified under class "A" by the American Bar Association will be admitted to examination.

[2] As it appears from the record these universities gave credit for the studies pursued in the San Juan School of Law. At that time the Superior Educational Council had not yet adopted rules of accreditation to which we shall refer hereinafter.

[3] 18 L.P.R.A. § 801 *et seq.*

[4] It is necessary to note that the Legislative Assembly indicated that the norms "shall adjust to the principles and methods practiced by known accrediting systems similar to this, embracing all the organic and operational features of the institutions to which they shall apply, such as the qualifications and composition of the faculty, the curriculum, the contents thereof, academic distribution and evaluation, the cultural product, administration and supervision, the physical plant, the equipment, and any other aspect in relation to its organization and operation." Section 2 of Act No. 88 of April 25, 1949, 18 L.P.R.A. § 802.

to which the reports attached to this decision refer.

The law school of the Inter American University started to operate in the month of August 1961, offering a night course. Twenty months later—in April 1963—the petitioners graduated with a law degree after having pursued four trimesters of studies.

On November 30, 1962 we amended Rule No. 8(1) to add the following paragraph:

"The exercise by the Superior Educational Council of its function of approving law schools established in Puerto Rico, for the purposes of this Rule, shall not impair the inherent power of this Court to make its own determination as to the admission of graduates from said schools to the bar examination, *under circumstances warranting it.*" (Italics ours.)

A typical application of the ones under consideration is attached to a certificate issued by the Registrar of the Inter American University, from which it appears that its law school accredited the applicant for subjects completed after November 1959 and before June 1961 in the San Juan School of Law, an *institution which had not been accredited neither by the Superior Educational Council nor by this Court.*[5]

From the foregoing it is clearly inferred that without specifically going over the matter of the accreditation of the Inter American University, the petitioners do not comply with our rule provision to the effect that *all the studies* shall have been pursued in an accredited institution. To this respect it is good to underscore that when the law school of

---

[5] The 26 credits which were accredited with a simple review course were the following: Introduction to Law, *Criminal Law I, Criminal Procedure, Family Law, Right of Ownership, Legislation, Civil Procedure, Constitutional Law,* and *Successions.*

I do not think it can escape anyone, not even the most naive, that the accredited courses embrace the basic subjects of legal education.

It is worth while to make clear that the Law School of the Catholic University of Puerto Rico admitted thirteen students who had attended courses of the San Juan School of Law but the admission was made without taking into account such studies.

this university accredited in the summer of 1961 the studies pursued by the candidates in the San Juan School of Law it was of general knowledge that since November 1959 our Rules contained the requirement indicated. The same knowledge is expected of the applicants.

To circumvent the clear language of our Rules which contains the requirement that *all* studies shall be pursued in an accredited institution, an appeal is made to the exclusiveness of our function to admit candidates to bar examination. I admit that we have that function, but in the exercise thereof we are bound by the norms that we imposed upon ourselves in our Rules. It is plain to me that if the uncontainable and evident desire was to admit the petitioners, the only proper way was to amend Rule No. 8 (a) (1) (a) and eliminate the oft-mentioned requirement. It is therefore a regrettable countersense to attribute to others "a biased and prejudiced mind" in relation to this matter, unless it is a subconscious process of auto-characterization.

But there is more. Even if it may be stated that this requirement may be disregarded in the exercise of the "inherent power" to make our own determination as to the admission of graduates of law schools of Puerto Rico, as Rule No. 8 (a) (1) (a) states at present, this exercise is plainly conditioned to be "under circumstances warranting it." *Neither in the petition filed nor in the course of the consideration of this matter no fact has been set forth to show that the circumstances warrant the admission of the petitioners.* Some grounds have been advanced to justify the action of the majority, but a slight examination will reveal that they have no relation with the question raised, or they accept as true, facts which the most naive person would reject. Not even with the most refined exercise of suggestion can it be concealed that the only criterion which has supported the determination in question is of an alleged commiseration, which is out of place, since the facts as

previously set forth reveal that the petitioners had knowledge when they began their "studies" of the requirements contained in our Rules. They, as well as the institution which graduated them, committed an open and calculated violation of said Rules.

Limitations of time preclude me from discussing at length the quality of the teaching of law in the Inter American University. To compensate it in part, I attach to this opinion the report of the accreditation committee designated by the Chancellor of the University of Puerto Rico[6] and the reply thereto subscribed by the Dean of the Law Faculty of the Inter American University. A simple reading of both documents shows that there are incontroverted facts that militate against accreditation *at present*. To pretend to hold the contrary is to raise the condescendence to the rank of dogma.

This is why, using the standard of values which I have unalterably applied in my judicial actions, irrespectively of the identity of the persons concerned or of the entities affected, I cannot concur with the precedent laid down by the five colleagues of the majority, which forbids a deterioration in the quality of legal education in Puerto Rico.

I am authorized to indicate that Mr. Justice Ramírez Bages concurs in the foregoing.

---

[6] Section 3 of the Accreditation Act, 18 L.P.R.A. § 803, provides that once an application of accreditation is filed, the Superior Educational Council shall forward same to the Chancellor of the University "who shall designate three or more members of the faculty and the administration of the University, or from other educational centers or agencies for study. . . ." It is clear that in the organization of the accreditation committee the Chancellor has strictly abided to the letter of the law. Nevertheless, it is said that the same "does not respond to the best sense of the creation of an entirely disinterested and unbiased trying body." The best answer to this groundless statement is to point out that it was composed of Mr. Abrahán Díaz González and Mr. Manuel Abréu Castillo, and members of the university faculty—as required by law, we repeat— Lino J. Saldaña, José M. Canals, and Margaret Hall, attorneys at law.

# REPORT CONCERNING ACCREDITATION
## OF THE
## INTER AMERICAN UNIVERSITY SCHOOL OF LAW

*I. Appointment and Duties of the Accreditation Committee*

Pursuant to the provisions of Act No. 88 of April 25, 1949,[1] of the Rules of the Supreme Court of Puerto Rico[2] and of the rules approved by the Superior Educational Council on July 22, 1961,[3] in regard to the recognition of the law schools in Puerto Rico, on October 6, 1961, the Chancellor of the University appointed an accreditation committee composed of the following persons:

Mr. Abrahán Díaz González, Chairman

---

[1] The preamble of Act No. 88 reads as follows: To establish an accrediting system for colleges and other private institutions of higher learning; to establish the University of Puerto Rico as the official agency in charge of fixing the norms and requirements inherent in such a system, and to investigate and pass upon their recognition; to vest in the same University of Puerto Rico the power to inspect and classify the accredited centers of learning, with a view to raising their indexes of efficiency; to determine the conditions under which said colleges and other institutions of higher learning may obtain from the State the certificate of recognition, and for other purposes.

[2] Rule 8 provides that any applicant to be admitted to practice as an attorney who has pursued studies in Puerto Rico shall state that "he is a graduate of a law school approved by the Superior Educational Council . . ." On November 30, 1962 the Court added to this rule the following paragraph: "The exercise by the Superior Educational Council of its function of approving law schools established in Puerto Rico, for the purposes of this Rule, shall not impair the inherent power of this Court to make its own determination as to the admission of graduates from said schools to the bar examination, under circumstances warranting it."

[3] The Rules provide that, as soon as an institution notifies the Chancellor of the University of Puerto Rico of its purpose of organizing a school of law that seeks accreditation from the Superior Educational Council and sends an initial report ". . . The Chancellor will appoint an expert committee in legal education . . . which . . . will inform the Chancellor, at least once a year, on the progress of the School toward the purpose of achieving the norms required to be accredited."

Mr. Manuel Abréu Castillo[4]

Mr. Lino J. Saldaña

Professor Margaret Hall

Professor José M. Canals, Secretary.

The Chancellor designated Dr. David M. Helfeld, Dean of the Law School of the University of Puerto Rico, advisor to this Committee.

The Committee was entrusted with the duty to meet regularly with the authorities of the new school, to undertake those procedures of evaluation which it considered pertinent, and to inform the Chancellor, at least once a year, on the progress of the Institution in regard to the accomplishment of the norms required for the accreditation. The Committee held its first meeting on October 7, 1961.

## II. Procedures for Evaluation Followed by the Committee

To carry out its commitment, the Committee deemed necessary:

1. To establish a visiting program to the school;[5]
2. To weigh the standards used to select the students;
3. To compare the criterion of the convalidation of courses with the ones required by other organizations interested in the accreditation and good movement of the schools of law;[6]
4. To obtain and analyze representative samples of the examinations being offered;
5. To examine a representative member of the answers to such examinations;[7]

---

[4] Mr. Abréu Castillo withdrew as member of the Committee on September 17, 1962, when he was elected president of the Bar Association, because he believed that both positions were incompatible.

[5] The visits to class took place especially during the weeks starting April 3, July 2 and July 9, 1962. Some members of the Committee have paid additional sporadic visits.

[6] The norms established by the Association of American Law Schools for the sanction of courses approved in other schools, have been considered. (See page 15, infra.)

[7] From the examinations offered on April 1962, tests were on Constitutional Law, Labor Law II, Civil Procedure and Taxes; of the ones

6. To examine the grades conferred to the students;

7. To evaluate the norms for the selection of the Faculty, as well as the methods to endow it with continuity;

8. To obtain information about the number and selection of books and about the operation and growth of the library;

9. To appreciate other ancillary factors such as extracurricular activities, physical facilities, fitness of the classrooms, etc.

Although the Committee was ready to undertake the process of evaluation since October 1961, it was not until March 20, 1962 that the authorities of the Inter American Law School consented to have the same.[8] On April 3, 1962, the first visit to the classrooms and the first meeting with Dean Mr. Hipólito Marcano was held.

*III. Brief History of the Inter American University School of Law*

The Inter American University School of Law started its regular courses exclusively as a night school on August 1961. The class of the freshmen year consisted of 112 students. Furthermore, 100 candidates from unaccredited law schools were admitted as advanced students, after having submitted them, according to a report from the School, to a process of convalidation of courses during the summer of 1961.

In January 1962, a second class of beginners composed of 52 students was established; and in August 1962, a third class of 71 students.

The Law School operates without vacation periods, on the basis of the trimester system instead of semesters, for

offered on August 1962, Criminal Law II, Criminal Procedure, Torts II and Evidence.

[8] The president of the Committee intervened directly with Dean Marcano by telephone and by mail on February 15, 1962, to obtain an agreement in regard to the beginning of the evaluation procedures. In a letter dated March 20, 1962 Dean Marcano expressed to the Chancellor of the University of Puerto Rico his approval to implement the program of evaluation.

which reason the traditional program of studies is completed in three years. The School intends to confer the first Bachelor's degrees in Law in April 1963 to a group of 34 students who began their studies as advanced students in August 1961.

The classes are offered from six thirty to ten thirty at night from Monday to Friday at Bernardini's Building, Eleanor Roosevelt Avenue, Hato Rey.

Registration fees in the School amount to $250 per trimester if 9 or more credits are taken. Otherwise, the cost per academic credit is $25. This includes medical assistance, use of the library, etc.

*IV. Determinations of the Committee in Regard to Compliance by the Law School of the Inter American University with the Norms Established by the Superior Educational Council.*

In the process of evaluation the Committee has followed the standards established by the Council. The following conclusions are based on observations made by the members of the Committee and on the analysis of the documentation requested and obtained from the authorities of the School.

*Standard A*

THE CURRICULUM OF A GRADUATE SCHOOL ACCREDITED FOR THE TEACHING OF LAW SHALL PROVIDE SUFFICIENT TIME FOR THE STUDY AND DEVELOPMENT, IN A CLIMATE OF DEDICATION AND INTELLECTUAL DISCIPLINE, OF THOSE SUBJECTS AND ACTIVITIES NECESSARY TO PREPARE THE STUDENT ADEQUATELY TO PRACTICE THE PROFESSION OF LAW.

This standard first of all refers to the time necessary for developing a satisfactory process of professional formation. The necessity of a competent formative environment in addition to an adequate program of studies is also recognized.

The program of courses offered in the Inter American University School of Law has two important defects in regard to the time element. The courses are generally offered during two periods of two hours each per night. This

high concentration by subject[9] is oppressive for students who have already worked full time, and consequently limits considerably the benefit they can derive from the attendance to classes. The same concentration exists in the teaching loads of many professors. For example, during the present trimester (August–December 1962) there is a professor who teaches five courses weekly for fourteen hours in four nights, another teaches ten hours in four nights, and another one ten hours in three nights.[10]

In addition to this daily concentration there is still another one in terms of the yearly program. The trimesters continue uninterruptedly, without adequate periods of vacation or consideration to the physiological necessity of rest. The psychology of learning calls for an occasional hiatus to meditate, analyze, classify, and organize the knowledges acquired.

The standard also mentions "a climate of dedication and intellectual discipline." The evaluation made by the Committee proves that the school does not comply with the aforesaid requirement. There is little opportunity to establish a personal conversation between professors and students. There is no time to stimulate necessary activities for the adequate preparation of the student to practice the law profession. For example, up to the present time neither the faculty nor the students have published a law review. The lack of "a climate of dedication and intellectual discipline" is noticed in classes where the lack of discussion and analytic effort reveal a climate of intellectual fatigue and of superficiality in the task of teaching. Most of the professors ask

---

[9] From the 46 periods of class which are offered during the present trimester (August–December 1962), 32 are of two hours on the same subject.

[10] It is interesting to observe that the standard of the Association of the American Law Schools in relation to the full-time professors reads as follows: II-4, Maximum Teaching Loads. "A faculty member should not teach more than an average of eight hours per week."

very few questions of the students. The questions which the students ask show insufficiency of previous study of the subject involved.

The personal observation of the classes by the members of the Committee shows serious deficiencies in the teaching methodology. As a general rule the students are not required to have an adequate previous preparation and so their little participation in class is carried out on a basis of improvisation. Occasionally, in some classes written works or the reading of specific articles are required. Sometimes individual cases are assigned to each student. In other classes the professors merely dictate the legislative or jurisprudential rules without any critical analysis and without adequate organization. The analysis of a representative number of answers to the tests offered at the end of the first and second trimesters of the present years shows that the principal effort of the students consists in learning legal principles by heart to reproduce them then in the test book. This method has the approval of the professors, judging by the breakdown of the grades granted.

The distribution of grades for the trimester of August–December 1961, was the following: A-114, B-298, C-248, D-49 and F-34, and for January–April 1962: A-129, B-338, C-220, D-29, and F-30.[11] These grades show that they are considerably lacking in strict requirements, especially if we consider that from the candidates admitted during the last three trimesters the 62 percent, the 58 percent and the 63 percent had obtained less than 2.5 index in the Bachelor's degree.

The location of the classrooms is inadequate. The heat in the classrooms during summer is exhausting. The noises penetrate from one room to another. The faculty does not

_____

[11] The Committee obtained the grades granted in 6 of the courses offered during the trimester April–August 1962. More than half of them are A and B.

have offices in the school so that, even if there were time, there is no place where the teacher can receive the students for conference. Briefly, the Inter American University School of Law uses a superficial method of teaching which does not aim to build the type of juridical mentality which is an essential attribute of the lawyer. The Committee believes that the school does not comply with Standard A.

*Standard B*

THE CURRICULUM OF A GRADUATE SCHOOL ACCREDITED FOR THE TEACHING OF LAW WILL BE OFFERED IN A REGULAR PROGRAM OF STUDIES WHICH REQUIRES THE DEDICATION OF THE STUDENT FOR NOT LESS THAN THREE YEARS IN THE DAY SECTION. FURTHERMORE, THE REGULAR PROGRAM OF STUDIES IN THE DAY SECTION, CAN OFFER A PART-TIME OR IRREGULAR PROGRAM OF STUDIES OF THE SAME CONTENT AND QUALITY OF THE REGULAR PROGRAM, WHICH REQUIRES THE DEDICATION OF THE STUDENT DURING A PERIOD OF NOT LESS THAN FOUR YEARS.

If this standard were fully applied, the school could not receive accreditation, for two reasons. First, because the creation of a day program has not been provided; and second because the night program is offered in three years instead of four.

In a letter dated October 19, 1961, Dean Marcano expressed the following to the President of the Superior Educational Council, Cándido Oliveras:

"Section *b* provides that the regular program of studies will be of at least three years in the day section. Then it adds that *besides* the regular program of studies in the day section, the school can offer a *part-time* or *irregular* program of studies during a period of time covering at least four years. It is necessary that you interpret whether that provision means that an accredited Law School must offer principally a *day* program and *in addition* it can offer a night program. Our Faculty has exclusively a regular night program, since there is an extraordinary demand for this type of professional education, but we are in the best disposition to serve the interests of the people according to their needs.

"It is also established in that section that that 'part-time or irregular program' shall require the dedication of the student 'during a period of time of not less than four years.' We assume *arguendo* that this provision refers to the night program in which case it would be for at least four years. As you know, a night program of four years would necessarily be on the basis of two semesters per year. Our University has introduced successfully the system of three trimesters per year, which permits a law student to finish his career in the night section in three years. Our trimesters are exactly the same in time as the regular semesters of the university and the quality and content of our program of studies is the same as the regular day program of any accredited Law School, taking in consideration the peculiarities of our legal life. We respectfully urge you to give your interpretation to the effect that a Law School may operate exclusively in night sessions with a regular program of three years, if it operates through the system of academic trimesters."

In regard to the same problem the Chancellor of the University of Puerto Rico stated the following to Mr. Marcano in a letter dated December 28, 1961:

"Paragraph *b* of the standards indicates, as you point out, that the night programs will be subsidiary of a day program. The reason for such a provision is indicated in my initial explanatory statements. It is indispensable to have a stable organization, a basic nucleus of officials and professors entirely dedicated to attend to the responsibilities of the faculty and of the administration and it is supposed that a group thus constituted will normally work with students fully dedicated to their studies. You state that this is not the case with the Inter American University School of Law. It seems to transpire from your communication that you prefer to concentrate all your efforts, at least now, in establishing a night school of high quality. In such case and after being informed with more details of the circumstances under which the program is functioning, it may become necessary to reconsider the text of the standards.

"The minimum of four years in the night school required in paragraph *b* corresponds to the difference already indicated between the full-time studies and the ones that are not. The rule

assumes that those who study in a night school do so because they are engaged in other activities during the day. Experience indicates that in cases where such obligations exist the law student needs a larger period of time than the three years required everywhere from the student whose only responsibility consists in studying. Otherwise, the rule pursues an object and a precaution already described. If the circumstances of day work are not present in the case of your students, it would seem reasonable to re-examine the justification in that case of the requirement of four years which we have fixed as a minimum in the night schools."

It is interesting to point out that the two accrediting institutions of national character in the United States establish standards in terms of years instead of semesters or trimesters. The American Bar Association in its Minimum Standards for Legal Education, paragraph (b), requires:

"It (the school) shall require its students to pursue a course of three years' duration if they devote substantially all of their working time to their studies, and a longer course equivalent in the number of working hours, if they devote only a part of their working time to their studies."

This has been interpreted by the Council of the Section on Legal Education of the American Bar Association as follows:

"The curriculum and schedule of work of a full-time course shall be so arranged that substantially the full working time of students is required for a period of three years of at least thirty weeks each. A part-time course shall cover a period of at least four years of not less than thirty-six weeks each year."

And the Association of American Law Schools in its section 6-2 says:

"*Requirements.* A member school and a school to be acceptable for admission shall:

.     .     .     .     .     .     .     .

3. Require at least three years of law study for graduation of full-time students and four years for part-time students."

In view of the foregoing and independently of the fact that no compliance is had with the requirement of the day program, the Committee believe that the Inter American University School of Law, in offering a night program of three years instead of four does not comply with Standard B.

### Standard C

IN A GRADUATE SCHOOL ACCREDITED FOR THE TEACHING OF LAW ONLY THOSE APPLICANTS WHO HAVE OBTAINED A BACHELOR'S DEGREE OR ITS EQUIVALENT IN AN INSTITUTION OF HIGHER LEARNING ACCREDITED AND ACKNOWLEDGED BY THE SUPERIOR EDUCATIONAL COUNCIL AND WHO HAVE SHOWN TO HAVE SUFFICIENT CAPACITY AND INTEREST TO CONTINUE GRADUATE STUDIES AS INFERRED FROM HIS ACADEMIC INDEX, FROM THE RESULT OF STANDARD TESTS OF APTITUDE AND SCHOLASTIC ATTAINMENT AND FROM OTHER METHODS TO EVALUATE AND OBTAIN INFORMATION IN THIS RESPECT, WILL BE ACCEPTED.

The School complies with this standard insofar as it concerns the requirement that all candidates to admission should hold a Bachelor's degree. The Committee has been able to establish that the School does not apply a selective standard of admission and does not consider systematically those objective factors from which "sufficient capacity and interest to continue graduate studies," can be inferred. According to the standard, these factors are: the grade index and the result of standard aptitude and scholastic attainment tests.

From all the candidates accepted to begin their studies in August 1961, January 1962, and August 1962, the ones which were accepted with a grade index of less than 2.5 represented the 62 percent, the 55 percent and the 63 percent respectively; and the ones which were accepted with a grade index between 2.5 and 2.99 represented the 31 percent, the 37 percent and the 34 percent respectively. The candidates with 3.00 or more of average represented the 7 percent, the 8 percent and the 3 percent of the respective classes. An average of 2.5 equals C and an average of 3.00 equals a B. This offers a contrast with the grades obtained by the stu-

dents during the trimester January–April 1962, whichever: A-17 percent, B-45 percent, C-29 percent, D-4 percent and F-4 percent; that means that the 62 percent obtained grades of B or more.

The university general average is not the only test indicating the capacity of the candidates to admission, and the Committee made an additional study based on the results obtained in the Law Aptitude Test from Princeton for the only seventy applicants admitted in August 1961 and January 1962, who had taken it previously. Of these 70 candidates, 35 percent obtained a grade lower than 250 in such test and 40 percent obtained a grade between 250 and 299. According to the statistics published by the sponsoring entity—the Educational Testing Service—only 5 percent of a total of 101,992 candidates examined between 1957 and 1962 obtained a grade lower than 300.

The scale of the Princeton test fluctuates between a minimum of 200 and a maximum of 800. The general comparative table between 1957 and 1962 is the following:

| Punctuation Received | Percentage of candidates with lower punctuation |
|---|---|
| 725 | 99.6 |
| 700 | 99 |
| 675 | 97 |
| 650 | 95 |
| 625 | 92 |
| 600 | 87 |
| 575 | 81 |
| 550 | 74 |
| 525 | 66 |
| 500 | 57 |
| 475 | 47 |
| 450 | 38 |
| 425 | 29 |

| Punctuation Received | Percentage of candidates with lower punctuation |
|:---:|:---:|
| 400 | 22 |
| 375 | 16 |
| 350 | 11 |
| 325 | 7 |
| 300 | 5 |
| 275 | 3 |
| 250 | 2 |

The School authorities have made known that after the present trimester candidates who have not taken the Princeton test will not be accepted. It has not been informed whether a minimum grade will be required therein.

According to information furnished to the Committee, the School determined the qualifications of some candidates by means of letters of recommendation and interviews with the Dean.

We believe it is indispensable to make some comments on the group of one hundred students who entered in advanced classes in August 1961, and who came from nonaccredited schools of law. Each one of these students was permitted to approve up to 9 subjects by means of a procedure established during the summer of 1961 and which the authorities of the School consider as sui generis. By letter of October 3, 1962, Mr. Marcano, the Dean, informed the Committee the rule followed by the School in regard to this particular:

"Any student who has passed courses in a nonaccredited school will have to repeat such courses in our school and pass the corresponding final test, but considering the fact that he has already passed those courses under the direction of competent teachers, even in nonaccredited schools, our Faculty will offer him intensive review courses of twenty hours of duration, at the end of which a test on the whole subject of the course will be given and the student will be approved according to his grade

in the aforesaid test. No student who has passed a course in one of those nonaccredited schools with less than 'C' qualifies to take the review courses and all of them will have to comply with the other requirements of admission."

By this method nine courses were offered during the summer of 1961. Some students passed up to nine courses, which is the equivalent to one year of law studies. In brief, the 100 students tried to pass 400 courses and they failed only in four: an average of failures of 1 percent for the whole procedure.[11-a]

Even though the Dean, Mr. Marcano, offered his cooperation to obtain the tests for convalidation and their answers of such courses, this material has never been put at the disposal of the Committee.

The Committee concludes that the Inter American University School of Law complies with the requirement of possession of a Bachelor's degree or its equivalent, obtained in an accredited institution, but that it does not comply with the other requirements established by the Superior Council in Standard C.

*Standard D*

THE FACULTY OF A GRADUATE SCHOOL ACCREDITED FOR THE TEACHING OF LAW SHALL BE COMPOSED OF COMPETENT TEACHERS. AT LEAST SIX TEACHERS, INCLUDING THE DEAN, SHALL CARRY OUT A FULL-TIME PROGRAM DEDICATED TO THE TEACHING LABOR, WHICH WILL INCLUDE THE TEACHING, IN-VESTIGATIONS, STUDIES, AND DOCUMENTS RELATED WITH LAW.

The faculty of the School during the trimester May–August 1962, was composed of the following professors (the

---

[11-a] It shall be pointed out that the Rules of the Association of American Law Schools provides the following in relation to the convalidation of courses approved in schools of law nonaccredited by that entity nor by the American Bar Association: *"Advanced Standing.* Non Member Schools. A member shall not accept for advanced standing credit earned at a school which is not a member of the Association or provisionally approved by the American Bar Association."

number means the teaching hours per week) : Mr. Benjamín Ortiz (5), Mr. R. Ramírez Pabón (7), Mr. J. B. Fernández Badillo (6), Mr. F. Pagán Rodríguez (8), Mr. J. C. Santiago Matos (8), Mr. Basilio Santiago (5), Mr. Domingo Toledo (5), and Miss Carmen Pura Jiménez (2), who is also librarian of the School.

During the present trimester (August–December 1962) the professors are Mr. Ortiz (14), Mr. Ramírez Pabón (10), Mr. Pagán Rodríguez (10), Mr. Santiago Matos (10), Mr. Santiago (3), Mr. Toledo Alamo (10), Miss Jiménez (2), and the following did not teach last trimester: Mr. Efrén Bernier (4), Mr. A. Fiol Negrón (9), Mr. Orzábal Quintana (2), Mr. Vincent Rotolo (2), and Dean Marcano (2).

Dean Marcano considers Mr. Ramírez Pabón, Mr. Fiol Negrón, Mr. Pagán Rodríguez, Mr. Toledo Alamo, and Miss Jiménez as full-time teachers. He classifies Mr. Benjamín Ortiz and Mr. J. C. Santiago Matos as professors upon whom there is controversy in regard to whether they are full-time or part-time and Mr. Fernández Badillo, Mr. Basilio Santiago, Mr. Efrén Bernier, Mr. Arturo Orzábal Quintana, and Mr. Vincent Rotolo[11-b] as part-time professors.

The authorities of the Inter American University have expressed doubts about the interpretation which should be given to the phrase "a full-time program dedicated to teaching" which under the above-entitled Standard concerns "at least six teachers, including the Dean." In a letter addressed to Mr. Cándido Oliveras on October 19, 1961, Mr. Marcano stated the following on this point:

"We refer now to paragraph d. We perfectly agree with it. However, the definition of what is a professor with a 'full-time program dedicated to teaching . . .' requires a new test and evaluation when it is applied to an exclusively night law school. Our professors with full-time programs are engaged exclusively

---

[11-b] Letter of October 8, 1962, from Mr. Marcano, Dean, to the Secretary of the Committee.

in legal teaching including investigations and studies, during the night working hours and even part of the day hours, but we cannot require them to engage themselves to this task during all the day hours and also during the night. Then their program would not be full-time, but double time.

"In the academic world there are distinguished professors who teach their full-time day program, but they dispose freely of their night time and week ends. And there are even some that after finishing their full-time work, dispose of their free time for professional activities that are the complement to their studies, investigations and documents related with Law and with the practice of the profession. This is how the Schools of Law have on their Faculty outstanding figures of the Bar, who give prestige to the Faculty and who in no other way could give their services to the university function and to youth. Undoubtedly, the intention of the Council was not to situate a night School in the burdensome position that its full-time faculty should have to dedicate all the academic night hours and also the day ones to its noble university task."

The Chancellor of the University of Puerto Rico deemed proper to explain this point brought up by Mr. Marcano, Dean, with the following comment:

"the answer in regard to your statement about paragraph *d*, is implied in the former considerations. The professor who works regularly in the practice of his profession, in his office, in the government, or in any other work of this nature, does not comply with the full-time work, even if he should devote all the night hours to his work in the Law School."

> (Chancellor Benítez to Mr. Marcano, Dean, December 28, 1961)

Three months later the Dean, Mr. Marcano, reiterated his position in the following terms: (Mr. Marcano to Chancellor Benítez, March 20, 1962)

"However, we have not made clear the important question of what the concept 'full-time professor' means in an exclusively night Law School. You should remember that we exchanged views in regard to this particular and that we clearly established

our position in regard to what in our judgment means full-time work for a professor in a school like ours. It is of basic importance that this point be duly clarified. In the course of the next three years, we shall increase our faculty in accordance with the growth and necessities of our school and we need a rule for our guidance in that sense. Such rule should consider among other factors, the necessity of the students to receive their teaching from learned and devoted professors in the subjects which they practice and explain and likewise the quality of legal education that we want to offer to the students so that they will serve our country in its social and juridical development. Nor should that rule be so strict or limited when applied to a night Law School as to deprive the students and the Faculty from the full-time services of professors of that professional quality or as to require their dedication to the faculty—not only full-time in the night, but also during the day hours. Such requirement would convert them into double time professors instead of full-time professors and it would become a burdensome impediment to the growth of the institutional and academic life of a night school."

During the present trimester the professors which the School considers full-time task teach the following courses:

*Mr. Benjamín Ortiz* (14 hours weekly)
Introduction to Law (2 sections)
Evidence
Contracts of Common Law
Extracontractual Civil Liability

*Mr. Ramírez Pabón* (10 hours weekly)
Obligations and Contracts (2 sections)
Forensic Practice

*Mr. Fiol Negrón* (9 hours weekly)
Special Legal Proceedings
Successions (2 sections)

*Mr. J. C. Santiago Matos* (10 hours weekly)
Civil Procedure
Constitutional Law
Administrative Law (2 sections)

*Mr. Toledo Alamo* (10 hours weekly)
    Family Law (2 sections)
    Mortgage Law

*Pagán Rodríguez, Doctor* (10 hours weekly)
    Criminal Law (2 sections)
    Criminal Procedure
    Criminal Law Seminar

*Miss Carmen Pura Jiménez* (Librarian)
    Legal Bibliography

Of the seven professors mentioned, only Mr. Fiol Negrón, Mr. Ramírez Pabón and Mr. Toledo Alamo are principally dedicated to the professorship. Of the rest, Mr. Ortiz is a legislator, a prominent political leader, president and member of Legislative Committees and active professional; Mr. Santiago Matos is Chief of the Tax Cases Division from the Department of Justice, one of the governmental bureaus in Puerto Rico which has the greatest volume of work; Doctor Pagán Rodríguez is Chief Editor of the Criminal Reform Committee; and Miss Jiménez holds a position from eight to twelve in the morning with the Urban Renewal and Housing Corporation.

The question stated herein is not novel; it has been considered previously by other accrediting institutions. The standards of the American Bar Association require the schools of law to have "among its teachers a sufficient number giving their entire time to the school to insure actual personal acquaintance and influence with the whole student body."[12]

Therefore, the Association of American Law Schools provides:

"A full-time teacher is one who devotes substantially his entire time to his responsibilities as a teacher, scholar, and

---

[12] Minimum Standards of the American Bar Association for Legal Education, (1) d.

educator, broadly conceived to include limited professional activities outside the law school that contribute to the faculty's fulfillment of the criteria for a competent faculty set out in Section II-1, if such outside activities are sufficiently limited that the teacher's basic faculty duties remain in fact his primary interest and responsibility.

"A faculty member should not teach more than an average of eight hours per week.[13]

Standard D of the Superior Educational Council requires that the Dean of a school of law who seeks to be accredited shall "carry out a full-time program dedicated to teaching." The rules of the Association of American Law Schools[14] contain identical standards.

The intellectual and administrative direction of the Inter American University School of Law is performed by Mr. Hipólito Marcano, who is at the same time senator, outstand-

---

[13] A Special Committee for the Administration of the Law Schools of the AALS in relation to part-time teachers recently expressed thus: "Scholarly practitioners of law can undoubtedly be used to great advantage as part-time teachers for courses which demand a more intimate insight into the practice of law. Many full-time teachers either have never acquired the practical experience demanded by such courses or have lost all contact with the practice of law. Part-time teachers act as a leaven in a sometimes too academic dough, both for students and for the full-time faculty. Particularly in large urban areas, men with highly specialized experience can be obtained as part-time teachers.

On the other hand, part-time men are not professional teachers. By reason of other commitments, they are usually not available for frequent consultation by students and may be lacking in immediate preparation for their classes. While the presence of some part-time teachers in a school (and particularly in a part-time division) makes it more difficult to carry out a sound educational program in a truly academic atmosphere. The averages provided by the decanal inquiry indicate that far too many schools rely too much on the services of part-time teachers. Certainly, economy in time or salaries should not be regarded by any reputable school as an end to be achieved through excessive hiring of part-time teachers." Anatomy of Legal Education, pp. 322, 323 (1961).

[14] *II-5. Full-time Dean*—Except in case of emergency a member school shall not have as its administrative head or dean a person who devotes less than full time to the work of administration and instruction.

ing political, labor and religious leader; and an active professional. He is also in charge of teaching Labor Law.

A recent investigation sponsored by the Association of American Law Schools revealed that "The deans estimate the average actual faculty work week at 52.94 hours."[15] This figure covers the work of a teacher who is devoted substantially to teaching, including investigation, preparation of documents and annotations, conferences with students, and participation in other necessary activities for the formation of the future professionals.

In the Inter American University School of Law there are at present only three teachers who can dispose of a number of adequate hours to be devoted to the work of teaching each week. The other four teachers considered as "full-time" by the School, and the Dean, do not dispose of sufficient time to carry out their responsibility of teaching as full-time teachers.

The daily and yearly concentration of courses and the aforesaid situation contributes to the superficiality of teaching which we have pointed out previously.

The Committee believes that the School does not comply with the provision of Standard D.

*Standard E*

MOST OF THE TEACHERS WITH FULL–TIME PROGRAM SHOULD HAVE ACADEMIC DEGREES FOR ADVANCED STUDIES OF LAW OBTAINED FROM UNIVERSITIES ACCREDITED OR APPROVED BY THE SUPERIOR EDUCATIONAL COUNCIL OR SHOULD HAVE DEMONSTRATED THEIR CAPACITIES AS SCHOLARS OF LAW. BESIDES THE FULL–TIME TEACHERS, THE SERVICES OF PART–TIME TEACHERS CAN BE USED WHEN THE NECESSITIES OF THE SCHOOL OF LAW REQUIRE IT.

None of the professors whom the Committee considers as full time has "academic degrees for advanced studies of law" even though the Committee agrees with the opinion of the School in the sense that "a majority (of these) . . . have

---

[15] A.A.L.S. Proceedings, p. 61 (1961).

demonstrated their capacities as scholars of Law." Considering this standard together with the preceding one, which requires the compliance with these requirements by the majority of a faculty composed of "at least six teachers including the Dean," the Committee concludes that the School does not comply with this Standard.

*Standard F*

THE LIBRARY OF A GRADUATE SCHOOL ACCREDITED FOR THE TEACHING OF LAW SHALL CONTAIN NOT LESS THAN 12,500 VOLUMES IN GOOD CONDITION AND SELECTED ACCORDING TO THE NECESSITIES OF THE TEACHING AND PRACTICE OF LAW IN PUERTO RICO. THIS AMOUNT OF BOOKS WILL BE INCREASED BY A THOUSAND VOLUMES EVERY YEAR. BESIDES, EVERY YEAR A DISBURSEMENT NOT LESS THAN $8,000 WILL BE MADE FOR THE ACQUISITION OF NEW BOOKS FOR THE LIBRARY.

Not until the inventory that is being prepared in the library is finished will we know the exact number of volumes which the School has at present. Approximately there are between 10,000 and 12,000 volumes at the end of the third year of teaching and the School is on the way to satisfy this requirement.

The library already has a good selection of books which includes the following collections: National Reporter, American Digest, American Law Reports, American Jurisprudence, Corpus Juris Secundum, Shepard's Citations and about 250 volumes related with Civil Law. The following magazines are also complete and up to date: American Bar Association Journal, California Law Review, Columbia Law Review, Law and Contemporary Problems, Michigan Law Review, Yale Law Journal and the Journal of Criminal Law and Criminology. Five of the best juridical magazines in Spanish as well as the state reporters preceding the National Reporter System have been ordered.

There still remains to be acquired new collections of juridical reviews, text books, and materials of civil law. We have been informed that either Professor Jiménez or the Dean will go to Spain this winter to do book shopping.

*Previous Expenses and Actual Budget*

The School informs that up to November 1, 1962, the amount of $62,415.54 had been spent in books. The budget of the Library for the academic year 1962–63 is $31,920 broken down in the following form:

| | | |
|---|---|---:|
| (a) | Salaries including the one of the Librarian | $12,600 |
| (b) | Equipment | 800 |
| (c) | Books and Subscriptions | 18,000 |
| (d) | Office Material | 400 |
| (e) | Miscellaneous | 120 |
| | | $31,920 |

The space devoted to the library is being extended to accommodate 5,000 additional volumes. Two rooms will also be equipped for the use of the librarian and the file clerk.

The time schedule of the library is the following: Working days from 1:00 P.M. to 10:30 P.M.; Saturdays, Sundays and holidays from 8:00 A.M. to 5:00 P.M. Until a short time ago the Library opened at 5:00 P.M. on working days instead of 1:00 P.M.

The Committee believes that the School is on its way to comply substantially with this standard.

*Standard G*

THE LIBRARY WILL BE ORGANIZED AND DIRECTED BY A COMPETENT LIBRARIAN ENTIRELY DEVOTED TO THIS FUNCTION AND IT WILL ALSO HAVE, IN SUFFICIENT AMOUNT, THE NECESSARY COMPETENT TECHNICAL PERSONNEL FOR ITS ADEQUATE FUNCTION.

The library is ably directed by Miss Carmen Pura Jiménez, who is a graduate in Law and Library Science. Officially, Miss Jiménez works from 6:30 to 10:30 at night, from Monday to Friday, but she frequently devotes part of her free time to the library during the afternoon and on

the weekends. The librarian also holds a position in the Urban Renewal and Housing Corporation, from 8:00 to 12:00 in the morning.

The librarian of the School is assisted by the following personnel:

(1) A third year student who works between 1:00 and 5:30 in the afternoon, from Monday to Friday and frequently works extra hours on his own account;

(2) A second year student who works on Saturdays, Sundays and holidays from 8:00 in the morning to 5:00 in the afternoon;

(3) A file clerk who works officially from 5:00 in the afternoon to 10:30 at night from Monday to Friday. She occasionally works in the library on weekends on her own account. She does not have a degree in Library Science, but she has 20 years' experience working as file clerk in the Carnegie Library and on the Planning Board, where she works during the day;

(4) A person in charge of the circulation, who has also worked in the Carnegie Library, is a Law student and has approved the course of Legal Bibliography and works officially from 5:30 to 10:30 P.M.

In general terms the School partially complies with this standard.

In regard to the requirement which demands that the librarian devotes full time to the library, the School is not complying with Standard G. The Committee has doubts as to whether the technical personnel of the library is sufficient to cover the necessities of a library in formation.

## CONCLUSION

In its process of evaluation the Committee has carefully considered each one of the standards of accreditation established by the Superior Educational Council and is aware that

this process has the entire consideration of the minimum requirements and not merely a mechanical and isolated application of the standards. Even though the Inter American School complies substantially and partially with two of the seven norms, the Committee believes that it does not comply with the essential standards for the attainment of the objectives established by the Superior Council.

The way in which the School began to function—admitting advanced students and crediting them for courses in schools of law which are not approved—the concept of "full-time teacher" supported by the institution, the contents and the methods controlling the Faculty, the standards used in the selection of the students, the absence of intellectual strictness in the study, the concept we have of what education should be and the formation of lawyers, the type of tests offered and their qualification, compels us to conclude that the Inter American School does not satisfy the requirements, which as a whole are essential to deserve the accreditation of the Superior Council.

To our judgment the purpose of the standards of accreditation of the Superior Council is to establish those essential requirements which will guarantee to the community the quality necessary in the teaching centers of law, so that the students receive the essential intellectual formation for the practice of law. The spiritual and material growth of our country requires the training of competent professionals. The prominent participation of the lawyers in the public and private life of our society justify the zeal of our Supreme Court and of the Superior Educational Council and the climate of intellectual demand which shall prevail in the institutions dedicated to the teaching of law. These levels of excellence cannot and should not be sacrificed, in spite of the necessity which the country has for a greater number of lawyers and of the unfortunate position in which those students now find themselves, who in good faith registered in

a school of law that, as revealed by the previous evaluation does not comply and has never complied from its beginning, with the standards of the Superior Educational Council.

Respectfully submitted,

Abrahán Díaz González, *President*

José M. Canals, *Secretary*

Lino J. Saldaña

Margaret Hall

Río Piedras, Puerto Rico

December 21, 1962

STATEMENT TO THE PRESS
by
DR. RONALD C. BAUER
President, Inter American University of Puerto Rico
REGARDING
ACCREDITATION
OF THE
INTER AMERICAN UNIVERSITY SCHOOL OF LAW

San Germán, Puerto Rico
April 11, 1963

(Printed in full in Spanish in the Wednesday, April 17, 1963
issues of "El Mundo and "El Imparcial")

947

Normally, matters of accreditation are properly confined to the appropriate academic forum or judicial authority. However, a preliminary report containing erroneous information on the accreditation of the Inter American University Law School has been given to a segment of the press. Distasteful as it may be, Inter American University is forced to state clearly its position to the people of Puerto Rico.

Before making a detailed response, I want to emphasize six main points:

1. The IAU Law School has not been "rejected" or denied accreditation, as reported in the press. The matter is still *sub-judice*, that is, still in process, since the resolution of the Superior Educational Council is not *res judicata*, or finally determined.

2. The Supreme Court has ruled that it alone will decide who is to be admitted to the Bar, regardless of accreditation procedures. This means that IAU Law School graduates have equal opportunity with graduates of other schools while the matter is pending.

3. Inter American's admission and academic standards are equal to those of other Law Schools in Puerto Rico.

4. The physical facilities of the IAU Law School are definitely adequate. Our Law School library is qualitatively the finest in Puerto Rico.

5. The IAU Law School has a first rate faculty, composed of highly respected lawyers and teachers, many of whom have advanced degrees.

6. There has been a major failure on the part of those delegated to provide professional leadership in evaluating the IAU Law School. They have failed to secure the facts, they have distorted the truth and they have flaunted customary evaluation procedures.

The sharp controversy over this matter has revealed a basic difference in educational policy between Inter American University and its critics.

Inter American University, it should be noted, was the first institution of higher learning in Puerto Rico to be accredited by the Middle States Association of Colleges and Secondary Schools. It has pioneered for over fifty years in extending higher educational opportunities as broadly and as widely as possible to all Puerto Ricans. We believe there should be no limit to the opportunities available to any person, young or old, who has ability and the will to sacrifice time and effort to obtain a university education.

Democracy's richest investment must be in the maximum education for all people. A democracy can assure its future only by continually re-investing the maximum amount of effort and resources in education. This is doubly true for a democracy in a developing area like Puerto Rico. It has often been said that Puerto Rico's greatest resource is its people. Commitment to this belief must be reflected in educational policy. This is the heart of the educational philosophy of Inter American University.

Puerto Rico sorely needs more lawyers. The present number of jurists cannot adequately serve the expanding needs of the island. The Chancellor of the University of Puerto Rico, Mr. Jaime Benítez, in a speech delivered at the inaugural session of the Inter American Congress of Civil and Criminal Procedure, held in San Juan, P.R., in June 1962, said:

"The Law School is very small, and in size we could say it is the smallest of all the University's schools. I believe that the University of Puerto Rico is the only Spanish-speaking institution where you find the unusual percentage of only 400 law students out of a total student body of 22,000, as we have now.

"In our country, in Puerto Rico, the lawyers constitute the smallest profession, numerically speaking, of all the fundamental

professions. There are fewer lawyers than doctors in Puerto Rico; there are fewer lawyers than engineers; there are more full-time professors at the university than lawyers."

To overcome this weakness, Inter American University founded its Law School, with a faculty composed of the best professional lawyers, a first-class library and a functional and centrally-located building.

In seeking accreditation for this school, Inter American University has been confronted with a unique legal and educational situation that raises serious questions for private institutions of higher learning in Puerto Rico.

Under Law No. 88 of April 25, 1949, the University of Puerto Rico, and only the University of Puerto Rico, is the accrediting agency for other private universities and colleges on the island. We know of no other area of the world where the accreditation of universities and colleges depends on the discretion or will of the state university. We question the wisdom of such a system in the advancement of a healthy, free and democratic culture.

On December 12, 1960, the Supreme Court of Puerto Rico delegated to the Superior Educational Council the power to accredit law schools in Puerto Rico. Accordingly, we petitioned the Council for accreditation, after pertinent clarifications of the rules adopted for that purpose.

The Council in turn adopted norms of accreditation proposed by the Chancellor of the University of Puerto Rico. These norms again delegated the mandate of the Supreme Court, this time to the Chancellor himself. He appointed an "Accreditation Committee" composed of three professors of his own Law School (Professor José M. Canals, Lino J. Saldaña and Margaret Hall) and two practicing attorneys (Messrs. Manuel Abréu Castillo and Abrahán Díaz González. Mr. Abréu Castillo withdrew from the committee before its report was submitted to the Chancellor). Dean David Helfeld of the UPR Law School was appointed "advisor" to this

committee. Inter American was not advised of this latter appointment until October 6, 1962.

The Committee was entrusted with the duty "to meet regularly with the authorities of the new law school, to advise and orient it in the compliance with the norms of accreditation" approved by the Council on recommendation of the Chancellor.

Contrary to its instructions, the Committee met with the Dean of the Law School on only two occasions. It never met with the faculty; it never met with the President or Dean of the University.

It asked for voluminous documents and detailed information, all of which were submitted on time. Individual Committee members paid brief and sporadic visits to classes. Then, on December 23, 1962, the Committee submitted an adverse report to Chancellor Benítez.

The Dean of the IAU Law School submitted an answer to this report. The Chancellor in turn submitted the report, IAU's answer, and his own recommendations to the Council. The Council then issued a three-count decision: (1) It amended the accreditation norms to provide for the functioning of Law Schools with classes exclusively in the evening. (2) It determined that IAU Law School did not comply *YET* with the norms as amended (at that very meeting). (3) It advised IAU that as soon as the deficiencies were corrected, the Council would proceed to re-examine the case.

That is the situation at present. The IAU Law School has not been denied accreditation. It is in the process of achieving it. Now let us look at the report of the Accreditation Committee.

The report charges that our school lacks "a climate of dedication and intellectual discipline" and adds, "up to the present, neither the faculty nor the students publish a law review."

The first point is abstract and vague. The second requires comparison with the record achieved by other law schools. Let us take the case of the University of Puerto Rico Law School, since it presumably sets the mark for other schools on the island.

The Law Review of the University of Puerto Rico was first published in March, 1932, 19 years after the founding of the school. The IAU Law School is only two years old, but we already have definite plans for a Law Review.

The Committee alleged that the physical plant is inadequate, that the location is poor, and the heat in the classrooms is oppressive. The IAU Law School is located in a modern, four-story building in the center of the metropolitan area. Plans are aready underway for the construction of a new building on land recently donated to the University.

The UPR Law School, on the other hand, functioned during its first year (1913) in one room of the Baldorioty Building. It acquired one other room in its second year. From 1913 to 1941, it had five different homes. Finally, in that year, it was relocated in an old building formerly occupied by the Tobacco Institute. Situated at the rear of the UPR campus, the area was called "Siberia" by the students. Not until February, 1963, two months ago and fifty years after its founding, did the UPR Law School move into its own modern, air-conditioned building. It took half a century for a great University, with ample public funds, to house adequately its Law School. The same University now criticizes Inter American for failing to do the same in two years.

The report continues: "The IAU Law School complies with the entrance requisite of a Bachelor's Degree or its equivalent from an accredited university, but it does not comply with that part of the norm which requires the demonstration on the part of the student, of sufficient capacity and interest to continue his graduate studies, as shown by

his grade index, by the result of aptitude tests and other methods to evaluate and obtain information in that respect."

The fact is that IAU Law students are required to obtain at least 225 in Princeton Law Exam, while the regular standards for that test are 200. Five of our students possess doctorate degrees; 17 have masters degrees; and 19 postgraduate certificates. Further, 35% of the total student body is working toward advanced degrees. Is this a sign of inferiority? Did the committee compare the graduate grades of these students with their law school grades?

Even more, there is a serious question whether there exists valid criteria to comply with the norm established by the Council. Hear what David Helfeld, advisor to the Accreditation Committee says on the subject. In the UPR Law Review, Vol. 30, 1961, page 19, Dr. Helfeld writes:

"To what extent is it feasible to predict in advance aptitude for legal studies? Granting that absolute prediction is impossible, and that the most careful screening process will result in errors, how can the incidence of error be reduced? At present we are carrying on studies to determine the relative predictive value of the three criteria now in use. Answers are being sought to the following questions: Should the Princeton Test be eliminated, or should its relative weight in screening candidates be reduced? How accurate has been the predictive value of the faculty examination? Should grade indexes from different universities and from different schools within the same university continue to be treated on the basis of a fictitious equality?

Dissatisfaction with the present selection process, and the search for the fairest possible criteria, are natural reactions to certain stubborn facts: first, the percentage of students who fail; second, the percentage who drop out. Why students fail, and why they leave school for non-academic reasons, are questions about which no more than speculative answers can be offered at present."

The Advisor to the Committee confesses that there is no valid criteria at present to predict aptitude for legal studies.

Yet the Committee criticizes the IAU Law School for not applying these very criteria to predict aptitude!

Nonetheless, no student is allowed to register at the IAU Law School unless he has a Bachelor's Degree and a grade index of 2.00 or higher. He is not permitted to remain in school with a grade index below 2.00. How does this compare with the record of the UPR Law School? At Rio Piedras, no norms whatsoever were applied for the first 27 years of the Law School's existence. In the beginning, students were admitted directly from high school, and later with a so-called "pre-legal course", with no grade index requirements, no aptitude tests, and no other evaluating measurement. It was not until 1941 that UPR applied the admission standards that we have adhered to from our first day.

Of 32 candidates for graduation this month, all attended other law schools before entering IAU. Each took qualifying exams for every course accredited by IAU, and none received more than eight credits in this manner. Over one-half of the 32 have done graduate work. Six are CPA's; five hold Master's degrees; two have the Doctor's degree; four have Professional Certificates.

It should be pointed out here that Inter American follows the trimester system a relatively new concept in education, used by leading universities in the United States. The School year is divided into three, rather than two periods. By studying year-round, an IAU student, whether at the Law School or in the undergraduate program, completes more work in three years (nine trimesters) than students at other universities complete in four years (eight semesters). The credit hours of a trimester are the same as those of a semester.

The Committee charges that "none of the full-time professors have any advanced degrees in the study of law." The Committee apparently did not ask the Dean or the professors themselves about their qualifications, because this charge is

false. For the record, here are the qualifications of key members:

| PROFESSOR | QUALIFICATIONS |
|---|---|
| Mr. Rodolfo Ramírez Pabón | LL. B. University of P.R. 1916. LL. M. Georgetown University 1923. Advanced studies for the Doctor's degree, Autonomous University, Mexico, 1959–61. Thesis and final credits pending. Judge of the Superior Court for 13 years and Superintendent of Elections of Puerto Rico. |
| Mr. Domingo Toledo Alamo | LL. B. University of P.R. 1917. Advanced studies in law, University of California. Professor of Law, University of Puerto Rico for 20 years. |
| Mr. Ángel Fiol Negrón | LL. B. University of P.R. 1918. Judge of the Superior Court for 16 years. Registrar of Property for 5 years. Assistant Director of Land & Title Division, P.R. Reconstruction Administration. Chief, Opinion Division, Department of Justice, Assistant Attorney General of P.R. |
| Dr. Francisco Pagán Rodríguez | Law degree, River Platte National University, Argentina, 1940. Doctor of Law & Social Sciences, |

|  | National University of Buenos Aires, 1957. Consultant, Penal Reform Commission of P.R. |
|---|---|
| Mr. Juan C. Santiago Matos | LL. B. University of P.R. 1940. Post Graduate studies toward LL. M. Harvard University. Director, Tax Litigation Division, Department of Justice. |
| Mr. Benjamín Ortiz | A.B. Harvard University 1931. LL. B. Harvard University 1934. Judge of the Superior Court. Former Justice of the Supreme Court. Professor of Law, UPR Law School, 1938–1941. |
| Mr. Basilio Santiago | B.B.A. in Accounting from Temple University—1949. LL. B., Tulane University—1955. Post Graduate studies in Law, toward Master's Degree in Taxation, at New York University. |

All our professors (full-time and part-time) are lawyers admitted to practice before the Courts in and out of Puerto Rico. All of them have achieved success as jurists for their keen knowledge and study of the law and jurisprudence.

To clear the record, Dean Hipólito Marcano is not a Protestant Minister as stated in newspaper accounts. He has been Regional Director of the AFL-CIO, but resigned that position in 1960. Like some members of the UPR faculty and administration, he is a Commonwealth Senator and has a private practice. He is a man of great ability, great energy and great dedication. He is eminently qualified for

this service to higher education in Puerto Rico. Beginning this fall, he will be assisted by an Assistant Dean.

Back to the record of the UPR Law School again. During its first year, the school had only one professor, Mr. José Benedicto Géigel, who taught all the courses. He was an extraordinary jurist, but had no "advanced degree in the study of law." The advanced degree does not necessarily make a good lawyer or good professor. The UPR Law School was accredited by the American Bar Association in December, 1945, 32 years after it was founded. At that time, it had four full-time professors and four part-time professors.

At the end of the first two years, Inter American University's Law School has four full-time professors and eight part-time professors, all outstanding leaders of the profession.

The report of the Accreditation Committee is wholly negative. It ignores the positive accomplishments of the IAU Law School and thereby distorts its image.

We have, for example, a first rate library, second in quality to none on the island. It includes all national and federal reports, encyclopedias, commentaries on the law by the best legal talent of the old and new world, law reviews and decisions. It is directed by Miss Carmen Pura Jiménez, former law librarian of the Department of Justice and the Supreme Court of Puerto Rico, and the Law School of Kansas City University.

Our library now has approximately 15,000 volumes. Compare this with the record of the UPR Law School. In 1941, when the school was 28 years old, the library contained 3,600 volumes. On June 30, 1944, 31 years after it was founded, it had 4,500 volumes. When it was accredited on December 19, 1945, it had amassed 11,500 volumes. In this area, Inter American has surpassed in two years the 32-year accomplishment of UPR.

It is painful to have to answer the kind of charges that have been made against this university. The IAU Law School

was founded to serve Puerto Rico, to answer a need of our people. We intend to train lawyers of high ability and integrity, who will devote themselves to the profession of law with dedication, perseverance and faith in the future of this society and this culture. I do not believe that fair-minded men can challenge that aim, nor the great progress we have made toward achieving it.